NEW TECH MINING, INC.; Rama Development Co., Inc.; and Pikeville Energy Group, LLC, Appellants

v.

THC KENTUCKY COAL VENTURE I, LLC, Appellee

and

Bank of Mingo, Appellant

v.

New Tech Mining, Inc.; Rama Development Co., Inc.; Pikeville Energy Group, LLC; THC Kentucky Coal Venture I, LLC; Alma Energy, LLC; Darrell Williams; Nathan Williams; Blackberry Energy, LLC; and Nathan's Welding, LLC, Appellees

NO. 2014–CA–000144–MR, No. 2014–CA–000226–MR

Court of Appeals of Kentucky.

RENDERED: JUNE 3, 2016; 10:00 A.M.

Briefs for Appellants, New Tech Mining, Inc.; Rama Development Co., Inc.; and Pikeville Energy Group, LLC: Joe F. Childers, Bethany N. Baxter, Lexington, Kentucky

Briefs for Appellant, Bank of Mingo: Spencer D. Noe, Donald M. Wakefield, Lexington, Kentucky

Briefs for Appellee, THC Kentucky Coal Venture I, LLC: Michael J. Gartland, Lexington, Kentucky

Brief for Appellees, Alma Energy, LLC; Darrell Williams; Nathan Williams; Blackberry Energy, LLC; and Nathan's Welding, LLC: No Briefs Filed.

BEFORE: COMBS, NICKELL, AND TAYLOR, JUDGES.

*OPINION*

NICKELL, JUDGE:

In these related appeals, New Tech Mining, Inc. ("New Tech"), Rama Development Co., Inc. ("Rama"), Pikeville Energy Group, LLC ("PEG"), and Bank of Mingo challenge the Pike Circuit Court's grant of a Warehouseman's Lien pursuant to KRS[1] 355.7–209 in favor of THC Kentucky Coal Venture I, LLC ("THC"), against certain underground mining equipment, and finding the four entities were jointly and severally liable to pay the lien amount of $48,000.00.[2] Following a careful review of the record, the briefs and the law, we vacate and remand for entry of orders consistent with this Opinion.

Recitation of the extensive background facts along with the long and contentious procedural history of this matter could easily span dozens of pages. While certainly interesting—and perhaps adequate for multiple complex law school examination questions—a full narration is unnecessary for our resolution of the limited issue presented on appeal. Thus, we provide only a truncated version sufficient to illustrate the question.

Alma Energy, LLC, operated a coal mining operation known as the Netley Branch Mine in Pike County, Kentucky. Rama leased a continuous mining machine[3] to Alma and installed it in the underground mine in 2007. The continuous miner was subject to a security interest in favor of the Bank of Mingo. PEG installed other equipment at the mine site and in the underground mine for use by Alma in early 2008. The PEG equipment was encumbered by a security interest in favor of Banner Industries of N.E., Inc., which had been subsequently assigned to Eastern Bank of Boston, Massachusetts.

Major financial difficulties in Alma's business resulted in filing for bankruptcy protection in late 2008. THC ultimately

---

1. Kentucky Revised Statutes.

2. New Tech, Rama, and PEG filed a joint appeal and the Bank of Mingo separately appealed from the same order. Each appeal challenges the trial court's grant of a Warehouseman's Lien on statutory grounds and also presents separate but related challenges to the judgment. Based on our resolution, many of these additional challenges are moot and require no discussion. No consideration of the merits of any of these moot issues should be inferred from this Opinion. Likewise, we have fully reviewed each allegation of error raised by the parties, and the failure to specifically mention any issue should not

be construed as a failure by this Court to consider same.

3. A continuous miner is a large piece of coal mining equipment which cuts and loads coal in a continuous operation through the use of a rotating drum with hardened "teeth" to cut into the face of the coal seam and a conveyor system to load the coal onto a transport mechanism for extraction to the surface. The particular machine at issue in this case, a Joy Mining Machinery Model 14CM10–AA, weighs nearly 120,000 pounds, has a cutting width of over ten feet, and can mine and load coal at a rate of up to twenty-one tons per minute.

purchased Alma's rights, title and interest in the Netley Branch Mine and its equipment located at the mine site from the bankruptcy Trustee. Rama's continuous miner and PEG's equipment were not included in the bankruptcy estate and, thus, were not transferred to THC.

During this same time frame, Rama defaulted on its obligations to the Bank of Mingo, thereby authorizing the bank to take possession of the continuous miner. Thereafter, in early 2010, the Bank of Mingo and PEG[4] entered into a contract with New Tech to remove the equipment from the Netley Branch Mine site. Because the mine had been shut down, infrastructure repairs were needed and state and federal regulatory approval were required before New Tech could begin recovery of the underground equipment. New Tech requested permission from THC to enter the site to assess the state of the mine, perform the necessary repairs, and recover the equipment. THC denied the request and would not permit entry onto the mine site. This impasse resulted in the instant suit being filed on May 28, 2010, seeking a declaration of rights to remove the equipment from the mine site and an affirmative injunction requiring THC to permit access to the mine for completion of needed repairs and removal of the equipment. On June 18, 2010, the trial court entered the requested injunction to permit removal of the equipment.

In answering the complaint, THC admitted it had no interest in the subject equipment, but denied ownership of the underground portion of the mine or authority to permit entry into the mine.[5] Contemporaneously, THC filed an objection to the temporary injunction alleging plaintiffs

had failed to prove an ownership interest in the equipment and had failed to show existence of any irreparable injury sufficient to justify entry of an injunction. On August 2, 2010, the trial court entered a revised—and agreed upon—temporary injunction placing numerous obligations on each of the parties in an effort to protect the interests of all involved.

Less than sixty days later, THC moved the trial court to dissolve the temporary injunction based on its allegation that absolutely no steps had been taken by Appellants to comply with the order. Further—and central to this appeal—THC requested imposition of a Warehouseman's Lien pursuant to KRS 355.7–209 based on its assertion it had "been the *de facto* warehouse and storage provided for Plaintiffs without compensation ..." for the equipment at issue. In a novel twist of logic, THC asserted the trial court's June 18, 2010, temporary injunction and August 2, 2010, revised temporary injunction should be treated as "warehouse receipts" as defined in the statute. THC made no mention of its earlier contention it was not the owner of the property upon which the subject equipment was located. Following a hearing, the trial court entered an order dissolving the temporary injunction. Upon finding THC was paying for round-the-clock security at the site to protect the subject equipment from vandalism and theft, the trial court granted THC a Warehouseman's Lien "in the amount of $8,000.00 per month beginning on August 1, 2010 and continuing month to month" until the equipment at issue was removed from the Netley Branch Mine site.

---

4. Banner Industries and Eastern Bank allegedly consented to the removal of the PEG equipment upon which they held security interests.

5. It would not be until over three years later at a hearing held on December 12, 2013, that THC finally admitted it did, in fact, hold all property interests in the surface lands and underground mines.

Appellants moved to vacate the trial court's order, alleging THC blatantly acted in bad faith by obstructing any attempts at removing the equipment from the mine, thereby causing substantial collateral financial damage which further slowed efforts to remove the equipment. Additionally, the trial court's grant of a Warehouseman's Lien in favor of THC was challenged as having been entered in contravention of the controlling statute because THC could in no way be considered a "warehouse" as that term is statutorily defined. In response, THC accused Appellants of failing to act with due diligence, refusing to comply with the revised temporary injunction in any way, engaging in "procedural shenanigans," and utterly failing to prove any ownership interest in the subject equipment. By order entered on January 21, 2011, the trial court reinstated the revised temporary injunction and reserved ruling on "whether or not a warehouseman's lien may be imposed by [THC] and reserves ruling as to what, if any, compensation is due to [THC] for any storage or security as to equipment owned by any of the Plaintiffs located at the Netley Branch Mine." The equipment was ultimately removed from the mine by March 31, 2011.

The case sat dormant for nearly two years until, on February 27, 2013, THC moved the trial court to once again establish a Warehouseman's Lien against the equipment and to compel payment to discharge the lien in full. THC argued it was entitled to be paid $8,000 per month for the period between August 1, 2010, and February 1, 2011, for a total of $48,000, and that such sum should be ordered to be a joint and several obligation of New Tech, Rama, PEG and Bank of Mingo. Appellants opposed the motion, accusing THC of having unclean hands and arguing issuance of a Warehouseman's Lien was improper under the facts of the case.

By order entered on April 1, 2013, the trial court granted THC's motion and imposed a lien pursuant to KRS 355.7-209(1) against the "Pikeville Equipment" and the "Rama Miner" to secure a $48,000 obligation owed jointly and severally by New Tech, Rama, PEG and Bank of Mingo. After a hearing on several pending motions, by order entered on May 13, 2013, the trial court partially granted the Appellants' motion to alter, amend or vacate the April 1 order in respect only to the amount of the lien, and set the matter for a hearing on June 7, 2013.

Inexplicably, the trial court entered an order three days later taking the Appellants to task for failing to remove the equipment in a more expeditious manner, finding THC had provided security at the mine for the sole purpose of guarding the subject equipment, reaffirming its earlier grant of a lien and the amount thereof, and adding an additional *sua sponte* finding that THC was also entitled to a lien on equitable grounds. The May 13, 2013, order was brought to the trial court's attention and the June 7, 2013, hearing was subsequently rescheduled by agreed order on several occasions.

On December 12, 2013, the trial court conducted a full evidentiary hearing on the lien issue. During this hearing, THC admitted for the first time it had, in fact, received the leases to the Netley Branch Mine from the Alma bankruptcy estate in 2009—contrary to its position throughout the litigation that it did not own the actual mine in which the subject equipment was located but only the surface surrounding the mouth of the mine. THC agreed it was required by administrative regulation to protect the portal to the inactive mine from public access but asserted round-the-clock security was in place solely to protect the subject equipment and THC received no benefit from the security details. It

asserted it was not provided with necessary documentation required by the revised temporary injunction to permit entry into the mine to retrieve the equipment and denied thwarting removal efforts or otherwise engaging in wrongful conduct. Based on these assertions, THC argued it was entitled to repayment of the $48,000 it had expended for protection of the mine site and the subject equipment.

In response, Appellants presented proof other valuable equipment was present at the site belonging to entities other than themselves, the security company remained on-site for several months after the subject equipment had been removed, and THC had repeatedly obstructed good-faith efforts at removing the equipment. Appellants contended THC was not entitled to any lien due to its conduct, but even if it were, THC was not entitled to repayment of the full amount of monthly security costs. Proof of collateral economic consequences caused by the delay in removing the equipment was also presented.

On December 18, 2013, the trial court granted THC's motion to impose a lien on the subject equipment and ordered Appellants to jointly and severally pay $48,000 for the total cost of security services rendered from August 2010 through January 2011. The trial court opined THC incurred the expenses only because reasonable efforts to comply with the Revised Temporary Injunction had not been undertaken and THC received no benefit from round-the-clock security of the mine site. The order contained no reference to the Warehouseman's Lien statute, finding only that "equity requires" joint and several liability for the reimbursement. Because the equipment had been removed as requested in the initiating complaint, the trial court dismissed the complaint in its entirety. Subsequent motions to vacate

6. The tendered Amended Complaint sought to remove New Tech and Bank of Mingo as

the judgment and to file an amended complaint[6] were denied. These consolidated appeals followed.

The primary issue presented on appeal relates to the propriety of the trial court's grant of a Warehouseman's Lien. Although the attacks launched are multifaceted, our review of the record and the law reveals the lien granted was statutorily defective and our discussion will focus solely on that portion of the parties' briefs and arguments related to the applicable statute. We shall also address THC's contention that the trial court's *sua sponte* finding of an equitable lien served to cure any statutory deficiencies contained in prior orders.

■ Throughout the litigation below, THC maintained it was entitled to a lien pursuant to KRS 355.7–209, and it was on this statutory authority the trial court purported to grant THC the requested relief. In pertinent part, that statute states:

(1) A warehouse has a lien against the bailor on the goods covered by a warehouse receipt or storage agreement or on the proceeds thereof in its possession for charges for storage or transportation, including demurrage and terminal charges, insurance, labor, or other charges, present or future, in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law. If the person on whose account the goods are held is liable for similar charges or expenses in relation to other goods whenever deposited and it is stated in the warehouse receipt or storage agreement that a lien is claimed for charges and expenses in relation to other goods, the warehouse also has a lien against the goods covered by the warehouse receipt or storage agreement or

Plaintiffs, add two new defendants, and add new claims for relief.

on the proceeds thereof in its possession for those charges and expenses, whether or not the other goods have been delivered by the warehouse. However, as against a person to which a negotiable warehouse receipt is duly negotiated, a warehouse's lien is limited to charges in an amount or at a rate specified in the warehouse receipt or, if no charges are so specified, to a reasonable charge for storage of the specific goods covered by the receipt subsequent to the date of the receipt.

KRS 355.7–209. "Warehouse" is defined in KRS 355.7–102(1)(m) as "a person engaged in the business of storing goods for hire."

A review of the record clearly reveals THC fails to meet the statutory definition of being a warehouse in relation to the Netley Branch Mine site. In fact, in its pleadings below, THC claimed only to be the "de facto warehouse and storage" location for the subject equipment. No argument was advanced nor was evidence presented to show THC was either engaged in the warehouse business or was qualified as a warehouseman sufficient to advance its claim for a Warehouseman's Lien. Additionally, the record is completely devoid of any warehouse receipt or storage agreement pertaining to the subject equipment.[7] Thus, any attempt to secure a lien or preference against the equipment was wholly without authority of law. THC had no legal right or claim to the subject equipment, and its self-serving allegations regarding storage and security of the equipment, without substantially more, cannot serve as a basis for the requested lien.

The statute supra evidently refers to only such persons as in fact keep a warehouse to store goods in, and are engaged in that business. It cannot be that it was the intention of the legislature to provide that any and all persons might become legal warehousemen by simply receiving one particular piece of property in store, and issuing a receipt therefor.

*Bell & Coggeshall Co. v. Kentucky Glass–Works Co.*, 20 Ky.L.Rptr. 1089, 48 S.W. 440, 443 (1898) (internal citation and quotation marks omitted).

In the instant case, the subject equipment had been in operation at the Netley Branch Mine and was located at the site upon THC's acquisition of same. No bailor and bailee relationship was intended and none was created relative to the equipment, THC did not receive it "in store," THC was not engaged in the business of storing goods for hire, and no warehouse receipt or storage agreement was produced. Thus, KRS 355.7–209 is wholly inapplicable to the facts at bar. THC's reliance on that statute was improper and the trial court's grant of a lien thereunder was plain error. We therefore vacate so much of the trial court's orders granting such a lien.

■ Next, we turn to the trial court's *sua sponte* grant of an equitable lien in its May 16, 2013, order. Apparently, upon realizing its authority to grant a Warehouseman's Lien was circumscribed, the trial court attempted to salvage its award of costs to THC for security services under an equitable lien theory. Contrary to

---

**7.** THC's assertion that the trial court's June 18 and August 2, 2010, orders should be treated as warehouse receipts is so lacking in merit it justifies only cursory discussion. Warehouse receipts are issued by the entity receiving goods for storage to acknowledge possession and an obligation to deliver them at some later time. *See generally* KRS 355.7–

102. The trial court is not such an entity and its orders simply cannot be equated to warehouse receipts. To hold otherwise would undermine clear statutory requirements and do violence to over a century of business dealings in the warehouseman's realm and legal precedents regarding the same. This we will not do.

THC's contention, the trial court's action did not cure the initial statutory deficiencies, as its grant of an equitable lien was likewise in error.

■ There are two types of equitable liens in Kentucky. One arises "out of general considerations of right and justice as applied to the relations of the parties and circumstances of their dealings," *McFerran v. Louisville Title Co.'s Receiver,* 254 Ky. 362, 71 S.W.2d 655, 657 (1934), while the other arises "from a contract which shows an intention to charge some particular property with a debt or obligation...." *Id.* As previously stated, no contract related to the alleged storage of the subject equipment exists, so an equitable lien under these facts must stem from the first class, if at all. We are convinced no such equitable lien existed.

"The court of equity does not create the lien, but only recognizes and enforces it. *See generally* 30A C.J.S. *Equity* §§ 57, 58 (1949); 53 C.J.S. *Liens* § 31 (1949)." *State Street Bank & Trust Co. of Boston v. Heck's, Inc.,* 963 S.W.2d 626, 631 (Ky. 1998), *as corrected* (Mar. 19, 1998). In the instant case, the trial court impermissibly attempted to create something which otherwise did not exist. The thrust of the trial court's limited explanation regarding its decision to amend its prior lien orders appears to be based on its opinion Appellants failed to act in a sufficiently expeditious manner in removing their equipment from the mine site. We believe this to be an insufficient basis for an equitable lien, especially considering the "relations of the parties and the circumstances of their dealings" as required by black-letter law.

The relationship between the parties was clearly strained and acrimonious throughout the pertinent time frame. In fact, both sides accused the other of having unclean hands and failing to act in a proper manner to effectuate removal of the subject equipment. The finger-pointing and accusatory tenor of the opposing sides was unmistakable and typical of the way this matter was practiced throughout its time below. There was clearly no agreement or understanding that THC would have a lien on the Appellants' property by virtue of its location at the mine site. There was no evidence the parties had any accord with respect to virtually any issue whatsoever, and each seems to have acted in what was believed to be their own best interest, to the complete exclusion of the other. THC bought the mine site upon which Appellants' equipment was located and refused to permit entry to retrieve same until entry of the trial court's injunction requiring same. Appellants did not accede to THC's demands that certain protective steps be taken so as to insulate THC from potential liability until ordered to do so by the trial court. THC argues it was forced to incur $48,000 in security costs it would not otherwise have been obligated to pay had Appellants acted more promptly. Appellants contend they incurred substantial financial losses—perhaps into the millions of dollars—due to THC's blockade of the mine site because they were unable to retrieve the equipment in time to lease it to a third party. The hostile and discordant circumstances surrounding the dealings among these parties clearly militates against equitable relief, as none should be rewarded for their actions. In the absence of additional facts not present here, a court of equity is not justified in implying a lien on general equitable principles. The trial court impermissibly did so and the justification given for its decision was insufficient and unsupported under the law.

Finally, while there may have been other legal theories under which THC may have sought remuneration for its expenditures related to security at the mine site which it contended were incurred solely for the benefit of Appellants, it did not do

so. Instead, THC focused solely on the Warehouseman's Lien statutory scheme, a strategic decision which ultimately proved unsuccessful. It is not the responsibility of the courts to protect a party from its own misjudgement.

Therefore, for the foregoing reasons, the judgment of the Pike Circuit Court is vacated insofar as it purports to grant a lien in favor of THC for the provision of security services at the Netley Branch Mine site, and this matter is remanded for entry of such orders as are necessary to extinguish the liens previously granted.

ALL CONCUR.